2011 Ark. 487

**STATE of Arkansas, Appellant**

v.

**Steve JERNIGAN, Appellee.**

**No. 11–513.**

Supreme Court of Arkansas.

Nov. 17, 2011.

Martin Emmett Lilly, Harrisburg, for appellant.

Arlon L. Woodruff, Lake City, for appellee.

JIM HANNAH, Chief Justice.

The State appeals an order of the circuit court denying its petition for writ of quo warranto to obtain a ruling that appellee Steve Jernigan cannot legally serve as mayor of Lepanto because he does not "reside" within the corporate municipal limits of Lepanto. Because this case involves a petition for quo warranto directed to a municipal official, our jurisdiction is pursuant to Arkansas Supreme Court Rule 1–2(a)(3) (2011). We affirm the circuit court.

In a run-off election held on November 23, 2010, Jernigan was elected mayor of Lepanto. On December 28, 2010, the State, through the office of the prosecuting attorney of the Second Judicial District, Poinsett County, filed a petition for writ of quo warranto, seeking to prevent the usurpation of the office of mayor of Lepanto. The State alleged that Jernigan did not reside within the city of Lepanto as required by Arkansas Code Annotated section 14–42–201(c)(1) (Supp.2009). The circuit court ordered Jernigan to appear at a hearing and show cause why he should be permitted to remain as mayor of Lepanto. Jernigan filed a motion to dismiss and a response to the petition. The circuit court denied the motion to dismiss, and the matter proceeded to a hearing.

The following facts are adduced from the testimony and evidence at the hearing. In 1995, Jernigan bought a home located outside the corporate municipal limits of Lepanto at 13719 Highway 140 North; Jernigan lived there with his wife. Jernigan testified that on July 1, 2010, he rented a residence from Kenny and Glenda Watson at 614 Alexander Street, within the city limits of Lepanto, for one dollar a month. Jernigan stated that he moved a mattress into the residence and that he did not move any other furniture there because the residence was already furnished.

Jernigan also stated that he did not have a phone or cable television at the residence on Alexander and that he did not move any clothing or bathing and showering supplies there.

On August 6, 2010, Jernigan filed a Political Practices Pledge, Affidavit of Eligibility, and Petition for Nomination with the Poinsett County Circuit Court. In both the pledge and the affidavit, Jernigan stated that he was a candidate for the office of mayor of Lepanto, and he listed his address as 614 Alexander, Lepanto, Arkansas 72534. Poinsett County Clerk Fonda Condra testified that the address Jernigan listed on his pledge and affidavit indicated that he was a city resident and, therefore, he was eligible to run for mayor. Condra also testified that because Jernigan changed his address on his voter registration to 614 Alexander, she changed his precinct from rural to city, and he could no longer vote outside the city of Lepanto. On cross-examination, Condra testified that her office does not do anything to determine the accuracy of information submitted by candidates and that there was no procedure in her office to verify residency.

Jernigan testified that on September 1, 2010, he rented a residence from Carl and Patty Maddox at 234 Greenwood, within the city limits of Lepanto, for five dollars a week. Jernigan stated that he spent the night at that residence "all the time," but that he had no idea how many nights a week he normally stayed there because he did not keep a log of it. Ms. Maddox testified that the residence was furnished and that Jernigan paid her for twenty weeks up front. Jernigan stated that he did not bathe or shower at the Greenwood residence and that he kept his clothing in his truck.

According to Jernigan, he intended to make the property on Greenwood his per-

manent residence until he moved in to a residence he had recently purchased in Lepanto. Jernigan testified that on January 6, 2011, he closed on an apartment complex in Lepanto located at 151 Broad Street but that he had not moved in yet because the current tenant had not moved out. He further testified that he intended to move furniture in to the Broad Street property.

Jernigan testified that he did not intend to permanently abandon his home located at 13719 Highway 140 North. He also testified that he did not intend to move back to that home after he served as mayor. He stated that the purpose of keeping his home there was because it was the old family home that he purchased from other family members in 1995. Finally, Jernigan testified that he moved to a residence within the city limits of Lepanto so he could run for mayor.

Jernigan's wife, Judy Jernigan, testified that she had lived at 13719 Highway 140 North for sixteen years and that her husband lived there with her occasionally. She said that she was unsure how many nights he stayed there and how many nights he stayed at his apartment in Lepanto. Ms. Jernigan said that she had never been to her husband's apartment and that she had no plans to move in to the apartment. She also said that she had no intention of abandoning her home on Highway 140 North and that she had no intention of divorcing her husband.

Exhibits admitted at the hearing included a rental agreement between Jernigan and the Watsons to begin on July 1, 2010, for an apartment at the rate of one dollar a month; a rental agreement between Jernigan and the Maddoxes to begin on September 1, 2010, for an apartment at the rate of five dollars a week; 2011 personal-property assessments dated January 18, 2011, listing Jernigan's address as 13719 Highway 140 North, Lepanto, Arkansas 72534; a Political Practices Pledge signed by Jernigan on August 6, 2010, listing his address as 614 Alexander, Lepanto, Arkansas 72534; and an Affidavit of Eligibility signed by Jernigan on August 6, 2010, listing his address as 614 Alexander, Lepanto, Arkansas 72534.

At the conclusion of the hearing, the circuit court ruled from the bench and denied the State's petition for writ of quo warranto:

[L]et me say at the outset that the State has made—has given a strong implication, made a strong case that Mr. Jernigan's residence, within the city limits of Lepanto, is a subterfuge and a farce.

However, based on, and just looking at the facts of this case, Mr. Jernigan, according to him established initial residence on July 1, 2010 at 614 Alexander Street in Lepanto. The lease was with Kerry [sic] and Linda [sic] Watson. That's the address he listed in his political practices pledge that he gave to the county clerk, Fonda Condra. And I was looking at the date, I thought that was important, I looked at the date of his political practice pledge and I believe it was August 6, 2010; yes. So at that time Mr. Jernigan listed his residence as 614 Alexander. He says he still gets, has a mailbox there and occasionally gets mail there.

His next residence, within the city limits of Lepanto, according to Mr. Jernigan, was since September 1, 2010, that address is at 234 Greenwood in Lepanto. That address does in fact have, based on what the landlord testified is pretty much furnished.

And then now, as of January 6, 2011, Mr. Jernigan claims he closed on some property, used to be Riverdale Café with some apartments there that he hasn't moved in yet because the current tenant

hasn't moved out yet. But he still considers his address at 234 Greenwood to be where he's physically living, although the new address appears to be 151 Broad Street here in Lepanto, Arkansas.

Again, the State has presented some, some strong evidence and implication that this attempt at residence is a subterfuge and a farce and the Court could reasonably infer as much. But the Court holds that in election candidacy qualification purposes that the statute in this case merely says, must reside. There's not much guidance in that. There's no specific case law that the state, nor the Defendant has recited.

The Court finds at this time that the State did not meet its burden of proof. That Mr. Jernigan did not in fact, must reside within the corporate limits of Lepanto, Arkansas. Therefore, the Court denies the petition for writ of quo warranto.

The circuit court then entered a written order denying the State's petition, attaching and incorporating its findings from the hearing. The State appeals.

The State contends that the circuit court clearly erred in denying the petition because Jernigan did not "in truth and in fact 'reside' within the city limits" of Lepanto. The State claims that Jernigan's "temporary apartment" within the city limits of Lepanto cannot, as a matter of law, support a finding that Jernigan "resides" in Lepanto, especially when the evidence suggested that Jernigan had no intention of abandoning his home outside the city limits. The State further claims that, because the evidence in this case made clear

that Jernigan had no intention of residing in Lepanto, the circuit court clearly erred in finding that he had |₆fulfilled the residency requirements of section 14–42–201(c)(1).

Jernigan responds that he complied with the residency requirements of section 14–42–201(c)(1). He asserts that his uncontroverted testimony showed that he moved to Lepanto before he filed as a mayoral candidate and that he continues to reside in Lepanto. He also asserts that his testimony and his conduct demonstrated that he intended to move his residence to Lepanto.

 The standard of review in a bench trial is not whether there is substantial evidence[1] to support the findings of the circuit court, but whether the circuit court's findings were clearly erroneous or clearly against the preponderance of the evidence. *E.g., Searcy Farm Supply, LLC v. Merchants & Planters Bank,* 369 Ark. 487, 256 S.W.3d 496 (2007). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that a mistake has been committed. *Id.* Disputed facts and determinations of credibility are within the province of the fact-finder. *Id.*

 This appeal also involves an issue of statutory interpretation. We review issues of statutory interpretation de novo, as it is for this court to decide what a statute means. *E.g., Middleton v. Lockhart,* 344 Ark. 572, 43 S.W.3d 113 (2001). The basic rule of statutory construction is to give

---

1. In *Valley v. Bogard,* 342 Ark. 336, 345, 28 S.W.3d 269, 274 (2000), we erred in stating that "[i]n reviewing findings of nonresidency ... we must affirm if there is substantial evidence to support the finding." *Id.* (citing *Brewster v. Johnson,* 260 Ark. 450, 541 S.W.2d 306 (1976)). Bench trials of civil cases occur- ring on or after July 1, 1979, are subject to the clearly erroneous standard of review, rather than the substantial-evidence standard of review. *See* Ark. R. Civ. P. 52; *Taylor v. Richardson,* 266 Ark. 447, 585 S.W.2d 934 (1979).

effect to the intent of the legislature. *City of Little Rock v. Rhee*, 375 |₇Ark. 491, 292 S.W.3d 292 (2009). Where the language of a statute is plain and unambiguous, we determine legislative intent from the ordinary meaning of the language used. *Id.* In considering the meaning of a statute, we construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Id.* We construe the statute so that no word is left void, superfluous or insignificant, and we give meaning and effect to every word in the statute, if possible. *Id.*

At issue is whether Jernigan met the residency requirements of section 14–42–201(c)(1):

> In addition to other residency requirements imposed by state law for municipal office holders, candidates for the positions of mayor, clerk, recorder, or treasurer *must reside within the corporate municipal limits* at the time they file as candidates and must continue to reside within the corporate limits to retain elective office.

(Emphasis added.)

The term "reside" is not defined in the statute. According to *Black's Law Dictionary*, "reside" means "[l]ive, dwell, abide, sojourn, stay, remain, lodge." *Id.* at 1176 (5th ed.1979). Similarly, this court has stated that the act of residing in a particular area means " 'living' there [or] being 'physically present' " there. *Jenkins v.*

*Bogard*, 335 Ark. 334, 342, 980 S.W.2d 270, 274 (1998); *see also Hogan v. Davis*, 243 Ark. 763, 766, 422 S.W.2d 412, 414 (1967) (stating that, generally, "residence" means physical presence in a particular location).

▇ We are not persuaded by the State's contention that section 14–42–201(c)(1) requires that a candidate intend to be domiciled within the corporate municipal limits. This court has noted that the General Assembly is aware of the difference between the terms "residency" and "domicile." *See Quinney v. Pittman*, 320 Ark. 177, 895 S.W.2d 538 (1995). Had the legislature intended for section 14–42–201(c)(1) to include a domiciliary requirement, it would not have |₈used the word "reside" in the statute. Or, the legislature could have defined the term in the statute to include domiciliary intent, as it did in Arkansas Code Annotated section 14–14–1306 (Repl.1998),[2] the statute governing the residency requirements for county government officers.

▇▇ In the absence of a statutory definition for a term, we resort to the plain meaning of the term. *E.g., Calaway v. Practice Mgmt. Servs., Inc.*, 2010 Ark. 432, 2010 WL 4524659. Based on the plain language of the statute, we conclude that, for the purposes of section 14–42–201(c)(1), the legislature intended for "reside" to mean "live" or "be physically present." With that definition in mind, we must now determine whether the circuit court clearly

---

2. Section 14–14–306 provides:

(a) All county, county quorum court district, and township officers shall reside within their respective townships, districts, and counties.

(b) An office shall be deemed vacant if a county officer removes his legal residence from the county or if a district or township officer removes his legal residence from the district township from which elected.

(c) For purposes of this section, legal residence shall be defined as the domicile of the officer evidenced by the intent to make such residence a fixed and permanent home.

*Id.; see also Brick v. Simonetti*, 279 Ark. 446, 652 S.W.2d 23 (1983) (interpreting Ark. Stat. Ann. § 17–3605, the prior version of section 14–14–1306, and holding that where the candidate physically moved in to an apartment within the district and was living there, the circuit court did not err in finding that she was a resident of the district).

erred in finding that the State failed to meet its burden of proving that Jernigan did not reside within the city limits of Lepanto. Even though the circuit court suggested that there might be subterfuge on Jernigan's part, it ultimately credited Jernigan's testimony that he lived within the city limits of Lepanto, at 614 Alexander, when he filed for candidacy on August 6, 2010, and that he continued to live within the city limits of Lepanto at 234 Greenwood. This court gives due deference to the superior position of the circuit court to determine the credibility of witnesses and the weight to be accorded their testimony. *E.g., Lee v. Daniel,* 350 Ark. 466, 91 S.W.3d 464 (2002). We hold that the circuit court did not clearly err in finding that the State failed to meet its burden of proving that Jernigan did not reside within the city limits of Lepanto. Accordingly, we affirm the circuit court's denial of the State's petition for writ of quo warranto.

On a final note, we observe that the parties' arguments concerning the meaning of the term "reside" are largely based on this court's statement that, "[i]n determining qualifications of voters and public officials, the word 'residence' has usually been treated as if it were synonymous with 'domicile' and dependent to some extent upon the intention of the person involved." *Charisse v. Eldred,* 252 Ark. 101, 102–03, 477 S.W.2d 480, 480 (1972). We take this opportunity to clarify this statement, as it appears to have caused much confusion. A better statement of the law is that, in determining the residency of voters and public officials, this court has considered (1) whether a person was physically present in a particular location, or (2) whether a person intended to establish a domicile in a particular location. In other words, if a candidate was unable to establish residency by showing physical presence in the requisite location, this court has allowed a candidate to establish residency by showing domiciliary intent in the requisite location.[3]

Affirmed.

---

**3.** Our case law reflects that we have examined residence in terms of one's physical presence, or living in, the requisite city, county, district, township, school district, or state. *See, e.g., Valley v. Bogard,* 342 Ark. 336, 28 S.W.3d 269 (2000) (holding that where the candidate for state representative was required to be a resident of the district for one year prior to the election and the evidence reflected that he did not move to the district until some seven months before the election, he was ineligible to run for state representative of that district); *Jenkins v. Bogard,* 335 Ark. 334, 980 S.W.2d 270 (1998) (holding that the candidate did not meet the requirement that he reside in the district for one year next preceding the election when he was not "living" in the required district or "physically present" there beyond work and civic activities); *Davis v. Holt,* 304 Ark. 619, 804 S.W.2d 362 (1991) (holding that where candidate's property spanned two school districts and the constitution required residence in the political subdivision to be served by the elected official, the question was whether the candidate resided in the school district and the term "residence" as used in the constitution and statutes meant the place where the candidate's house was physically located); *Cummings v. Washington County Election Comm'n,* 291 Ark. 354, 724 S.W.2d 486 (1987) (holding that the candidate did not meet the statutory requirement of being a bona fide resident and elector of the school district when her property spanned two districts, and she admitted that her physical residence was not in the district where she sought election); *Hogan v. Davis,* 243 Ark. 763, 422 S.W.2d 412 (1967) (holding that Ark. Stat. Ann. § 42–404 (Repl.1964), which provided that the Director of the State Police be a resident of the state for at least ten years prior to his appointment, required the police di-

rector to have "actually lived" in the state for ten years prior to his appointment, and that, where the candidate lived out of state for more than seven of those ten years, he was not qualified to hold the office).

Alternatively, when physical presence during the requisite time period was lacking, we have looked to a person's domiciliary intent. *See, e.g., Clement v. Daniels*, 366 Ark. 352, 235 S.W.3d 521 (2006) (holding that candidate for lieutenant governor met seven-year residency requirement because even though there may have been periods of time when the candidate did not live in the state, he never abandoned his domicile in Arkansas); *Charisse v. Eldred*, 252 Ark. 101, 477 S.W.2d 480 (1972) (holding that where residency in the state for one year prior to the election of November 1970 was required, candidate for alderman had temporarily left his Arkansas residence from June 1968 until May 1970, had voted in the California general election in 1968, disconnected the utilities at his Arkansas dwelling before he voted in California, and executed a voter registration affidavit in Arkansas in September

1970, the circuit court did not err in ousting him from office because he was an ineligible elector); *Wheat v. Smith*, 50 Ark. 266, 7 S.W. 161 (1888) (holding that where twelve months' residency in the state next preceding the election was required, the candidate's Arkansas domicile was not changed by his service as foreign consul, because his domicile was presumed to continue in absence of proof to the contrary); *see also Hogan v. Davis*, 243 Ark. 763, 422 S.W.2d 412 (1967) (holding that, even assuming that the ten-year statutory-residency requirement could be satisfied by proving domicile, the candidate would still not prevail because during that ten-year period, he had declared under oath in Wyoming that he intended to reside there and that action negated any vague and indefinite expression of a desire to return to Arkansas). *But see Wilson v. Luck*, 201 Ark. 594, 146 S.W.2d 696 (1941) (holding that the residency of transient employees residing in the Civilian Conservation Corps camps was a question of fact in each particular case, depending on the intention of the individual enrollee).